# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MINE SAFETY APPLIANCES COMPANY**, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 2:09cv348 |
| | ) | Electronic Filing |
| **THE NORTH RIVER INSURANCE COMPANY** and **RIVERSTONE CLAIMS MANAGEMENT LLC**, | ) ) ) ) | |
| Defendants. | ) ) | |

## <u>OPINION</u>

Plaintiff commenced this action seeking redress for defendant North River Insurance Company's ("defendant") failure to pay proceeds under an umbrella commercial general liability policy for tendered losses arising out of underlying lawsuits advancing personal injury and wrongful death claims against plaintiff. Presently before the court are motions to file documents under seal and to redact privileged and/or confidential information from briefs and/or statements of material fact to be submitted in conjunction with each party's contemplated motion for summary judgment. For the reasons set forth below, plaintiff's motion will be denied and defendant's motion will be granted in part and denied in part.

Plaintiff's averments place the parties' dispute in the following context. "This is [an insurance coverage action] for breach of contract and statutory bad faith arising out of the failure and refusal of [defendant North River Insurance Company] (as the issuer of an umbrella liability insurance policy to [plaintiff]) . . . to honor the contractual and legal obligations [owed to plaintiff] in connection with asbestos, silica, and coal workers' pneumoconiosis ("CWP") bodily injury

(including death resulting therefrom) lawsuits in which [plaintiff] has been named as a defendant." Amended Complaint at ¶ 1. The applicable umbrella liability insurance policy ("the policy") allegedly obligates defendant to pay for defense costs and to indemnify plaintiff for amounts paid in settlement and satisfaction of judgment in those bodily injury lawsuits. *Id.* at ¶ 2. The policy follows the form of a Hartford policy. *Id.* at ¶ 13. Defense costs assertedly are "in addition to the applicable limit of liability of" the policy. *Id.* at ¶ 19.

"Since at least the 1980s, [plaintiff] has been sued in numerous bodily injury lawsuits in jurisdictions across the country, the majority of which involve respiratory protection and/or protective clothing products allegedly manufactured and sold by [plaintiff] (the "Underlying Claims")." *Id.* at ¶ 20. Plaintiff began to tender numerous settled underlying claims to defendant for indemnification in 2007 and continued to do so in 2008. *Id.* at ¶¶ 24-26. Plaintiff reiterated its demand for payment in February of 2009 and informed defendant that pursuant to *J. H. France Refractories Co. v. Allstate Insurance Co.*, 626 A.2d 502 (Pa. 1993), it was selecting defendant "to assume responsibility pursuant to the Policy for the indemnity and defense costs associated with other settled Underlying Claims" which encompassed the settlement of lawsuits involving claims by approximately 400 claimants. *Id.* at ¶ 28. Plaintiff seeks to establish that defendant is in breach for failure to abide by the policy provisions governing indemnity for covered losses for bodily injury claims in the amount of $20,274,186.00 and defense costs of $1,107,375.00. *Id.* at ¶¶17-19, 29, 39-43. Although claims exhausting the aggregate policy limit have been tendered to defendant, plaintiff continues to incur defense costs on the underlying claims. *Id.* at ¶ 32.

In addition, plaintiff has designated defendant "to assume responsibility for the defense costs associated with certain open Underlying Claims and certain closed-but-not-settled

Underlying Claims, as well as certain general expenses billed by [plaintiff's] national coordinating counsel and local defense counsel" as well as certain "non-settled Underlying Claims brought by another approximately 400 claimants." *Id.* at ¶ 30. The defense costs for these claims and the general expenses are in excess of $8,900,000.00. *Id.* at ¶ 31.

Defendant assertedly has failed and refused to comply with its obligations under the policy. *Id.* at ¶ 34. It has not paid anything toward the amounts claimed by plaintiff. *Id.* at ¶ 34. Instead, it has responded with "a carefully and deliberately orchestrated effort to delay and/or avoid payment of proceeds due under the Policy, with the ultimate goal of leveraging [plaintiff] into accepting far less than that to which it is entitled under the Policy (and under other excess liability policies that [defendant] issued to [plaintiff]." *Id.* at ¶ 35. This effort has included:

(a) raising spurious questions regarding exhaustion of the Hartford policy; (b) raising spurious questions regarding the integrity of certain of [plaintiff's] local counsel, when that same local counsel had been relied on for years by other of [plaintiff's] insurers; (c) positing that the Policy does not obligate it to pay defense costs in addition to limits, when the Policy could not state [defendant's] obligation to do so more clearly; (d) positing, after the fact, that [plaintiff] was required to obtain jury research to substantiate the reasonableness of amounts that it paid to settle certain claims, while never suggesting before the fact that such research was important to [defendant] or offering to pay for such research; (e) positing that [plaintiff's] claims experience in certain jurisdictions is irrelevant to the amounts that plaintiff has paid to settle Underlying Claims that have been presented for reimbursement under the Policy; (t) demanding that [plaintiff] provide reams of historical claims data that is wholly irrelevant to the Underlying Claims for which [plaintiff] has demanded payment under the Policy, and refusing to make such payments until [plaintiff] does so (and, even where [plaintiff] does so, still avoiding payment by simply issuing a new set of irrelevant and burdensome information requests); (g) refusing [plaintiff's] invitations to discuss directly with [plaintiff's] local and national counsel the basis for settlement recommendations that [plaintiff's] local counsel has made; (h) withholding from [plaintiff] information that [defendant] has learned in connection with other of its insureds who, like [plaintiff], are facing thousands of toxic tort claims in jurisdictions that are widely regarded as "plaintiff friendly," and otherwise refusing to share its own expertise (on matters such as jury awards and settlement amounts that occur in various jurisdictions throughout the United States) with [plaintiff]; (i) eschewing its fiduciary obligation to work in a collaborative fashion with [plaintiff] to

3

successfully defend and resolve Underlying Claims in favor of an inexplicably hostile and adversarial approach to [plaintiff]; and G) refusing to pay any Underlying Claims until [plaintiff] has provided claims information that goes far beyond what the Policy, the law, and even [plaintiff's] other insurers, require.

*Id.* at ¶ 36.  Defendant's orchestrated effort constitutes both a breach of its duties under the policy and bad faith insurance practices in violation of 42 Pa. C. S. § 8371.  *Id.* at ¶¶ 37-38.[1]

Plaintiff further explains in its brief that it seeks to establish that defendant owes coverage for 729 underlying claims.  Declaration of William J. Berner (Doc. No. 653-5) at ¶ 5; Plaintiff's Brief in Support of Motion for Leave to File Documents under Seal and to Redact (Doc. No. 653) at 11.  Sixty-six of those claims were still pending when plaintiff filed the instant motion.  *Id.* Plaintiff also is defending more than 9,100 additional personal injury cases relating to the same or similar products.  *Id.*

The parties have filed their respective motions to seal in conjunction with their respective contemplated motions for summary judgment.  These motions can only be understood to be

---

[1] Plaintiff more specifically contends that defendant acted in bad faith by:

> (a) failing and refusing to honor [plaintiff's] demand for reimbursement under the Policy without any adequate basis under the Policy or at law, (b) failing to pay proceeds under the Policy that are due and owing, (c) concocting various excuses, none of which have any merit under the Policy or at law, for delaying, and/or refusing to make, payment of amounts that are due and owing to [plaintiff] under the Policy; (d) engaging in improper claims-handling tactics, (e) using improper claims-handling tactics in an effort to pressure [plaintiff] into accepting less than that which it is owed under the Policy; (f) raising spurious questions regarding exhaustion of underlying insurance, and the integrity of [plaintiff's] defense counsel, without any reasonable or good faith basis to do so; (g) refusing to share with [plaintiff] its own expertise or knowledge such that [plaintiff] may defend itself against the Underlying Claims more effectively; and (h) dealing with [plaintiff] in an adversarial manner, and not in a cooperative manner or as a fiduciary.

*Id.* at ¶ 48.

complex and voluminous: approximately one year ago the parties filed 10 separate motions on summary judgment seeking an adjudication on an issue-by-issue basis. At that time they also sought to file under seal separate briefs on each issue and numerous related documents, including briefs, concise statements of material fact and appendices in support. All of these filings were struck from the record for failure to comply with the controlling authority governing the submission of materials under seal in support of relief on the merits and as otherwise moot. *See* Order of March 12, 2013 (Doc. No. 645) (striking Doc. No.s 595, 596, 600, 604, 606, 607, 611, 612, 616, 617, 618, 623, 624, 628, 631, 633, 635, and 637 and directing the Clerk to remove the documents from public view; denying 599, 603, 605, 610, 615, 622, and 630 for failure to comply with the controlling authority governing the submission of materials under seal in support of affirmative relief on the merits and otherwise denying as moot; and denying 594 as moot). A concomitant order was issued setting the schedule and procedures for re-filing motions for summary judgment and the submissions in conjunction therewith. *See* Order of March 12, 2013 (Doc. No. 646). The instant motions were filed pursuant to this scheduling order.

Extensive discovery was conducted pursuant to a protective order permitting the parties to designate documents and information as confidential. *See* Protective Order of January 4, 2011 (Doc. No. 69). This order authorized any party to make such a designation on the basis that the material being produced by the party or a third party contained "confidential, personal, trade secret, and/or commercial information, as those terms are defined under Federal law, not generally available in the public domain." *Id.* at ¶ 8. Discovery was coordinated with a companion case captioned as <u>The North River Insurance Company v. Mine Safety Appliances Company, Allstate Insurance Company, et al.</u>, GD No. 10-7432, and filed in the Court of Common Pleas of Allegheny

5

County, Pennsylvania.   An identical protective order was entered in the state-court action.   The parties elected to coordinate discovery and utilize a discovery master in both actions.   *See* Order of February 3, 2011, Appointing the Honorable Alan S. Penkower (Ret.) as Special Master For All Fact and Expert Discovery Disputes.   The parties thereafter filed extensive discovery motions, many of which were filed under seal with redacted versions being disclosed to the public.

The parties' March 2013 filings sought to honor and/or maintain the confidential designations previously made by the parties in discovery for the purpose of adjudicating the parties' cross motions for summary judgment.   As authority for maintaining portions of the supporting briefs and exhibits under seal the parties merely referenced the designations made under the protective order and/or the designations of third parties pursuant to the identical protective order entered in the companion state-court coverage litigation.   *See e.g.* Plaintiff's Motion to File Documents Under Seal re: Trigger of Coverage for Coal-Mine-Dust-Related Claims (Doc. No.s 610, 643).   The scheduling order of March 12, 2013, informed the parties that any motion to submit filings under seal must demonstrate that the "relief is authorized by and in full compliance with the principles governing the court's use of seal in conjunction with the right of access that attaches to matters that are submitted for an adjudication on the merits[,] . . . the parties will be required to meet their respective burdens in maintaining secrecy [and] [r]eliance on the confidentiality order entered in the instant case will be given minimal weight because of the over-inclusive nature of the protective order governing the parties' discovery productions and disputes."   Order of March 12, 2013 (Doc. No. 646) at ¶ 5 (citations omitted).

A prevalent practice has developed in this district wherein litigants in civil cases seek to file materials under seal pursuant to little more than a designation of confidentiality by one or more

of the parties pursuant to a broad protective order entered during the discovery phase of the case. The practice has long been employed during the discovery phase. It increasingly is being employed in the adjudicatory phase of the case without distinction between the two or acknowledgement of the differing standards that ultimately bear on the court's use of its authority to seal. But there is an important difference between the showing required to obtain a protective order authorizing confidentiality during the course of discovery and the one needed to maintain documents and information under seal that are part of the judicial record of an adjudication. *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001). And the parties' motions seek to satisfy the later.

A common practice also has developed to permit the requested filings to be made without a thorough review where they are submitted without objection and then to examine them more closely only when a subsequent challenge is made to the ongoing necessity of keeping the documents under seal. *See Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 166 (3d Cir. 1993) (emphasizing the important difference between the scope and nature of the review undertaken where the parties seek without meaningful objection to maintain confidentiality over judicial records based on the showing needed for a protective order and the review undertaken pursuant to a dispute grounded in the public right of access doctrine). The parties have not raised such a dispute or requested such a review.

Nevertheless, the court has an inherent obligation to review and supervise the files being placed on its docket and a concomitant obligation to assure that the use of its authority to keep matters from public scrutiny properly is being employed. *Id.* ("We must rely in the first instance on the district courts to protect the legitimate public interest in filed materials from overly broad

and unjustifiable protective orders agreed to by the parties for their self-interests.") (citing *United States v. Corbitt*, 879 F.2d 224, 228 (7th Cir. 1989) ("[T]he public's right to inspect judicial records may not be evaded by a wholesale sealing of court papers. Instead, the district court must be sensitive to the rights of the public in determining whether any particular document, or class of documents, is appropriately filed under seal.")). Further, we believe that the parties are better served if their proposed filings initially are reviewed under the standards that will govern any challenge to the use of this court's seal and they are able to make informed decisions about such filings and the course of the litigation in accordance with that initial assessment.[2] We turn to that undertaking as it relates to the parties' pending motions to seal.

The public right of access to judicial proceedings and records is integral and essential to the integrity of the judiciary. The common law right of access predates the Constitution. *Bank of America National Trust and Savings Ass'n v. Hotel Rittenhouse Associates*, 800 F.2d 339, 343 (3d Cir. 1986) ("The right of the public to inspect and copy judicial records antedates the Constitution.") (citing *United States v. Criden*, 648 F.2d 814, 819 (3d Cir. 1981)). The existence of the right is beyond dispute. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 780-781 (3d Cir. 1994) (citing *Littlejohn v. Bic Corp.,* 851 F.2d 673, 677–78 (3d Cir.1988) (the public's interest in access is "beyond dispute") (internal quotation marks and citation omitted)); *accord United States v. Martin,* 746 F.2d 964, 968 (3d Cir. 1984) (same).

The right is pervasive. *In re Cendant*, 260 F.3d at 192. It applies to all aspects of the

---

[2] Of course, this initial assessment is not intended to foreclose any challenge by a third party to any filings that ultimately are placed under seal. To do so would in effect be issuing an advisory opinion and an attempt to determine the rights of third-parties without affording them appropriate due process.

judicial process where substantive determinations are made. *Bank of America*, 800 F.2d at 343 (presumption of right of access applicable to various pretrial hearings encompassing substantive rulings); *United States v. Smith*, 776 F.2d 1104, 1111-12 (3d Cir. 1985) ("Although [the Supreme Court's cases] concerned access to judicial proceedings, no reason occurs to us why their analysis does not apply as well to judicial documents, as we previously so applied it in *Martin*, 746 F.2d at 968.") (citing *Associated Press v. United States District Court*, 705 F.2d 1143, 1145 (9th Cir. 1983)). It likewise attaches to documents filed with the court in conjunction with a request for adjudicatory relief. *Bank of America*, 800 F.2d at 343; *accord Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597 (1978) (The common law right of access gives rise to a presumption in favor of access to "public records and documents, including judicial records and documents.").

The "presumption that the public has a right to inspect and copy judicial records serves numerous salutary functions." *Leucadia, Inc. v. Applied Extrusion Technologies, Inc.*, 998 F.2d 157, 161 (3d Cir. 1993). The right of access "in civil cases promotes public confidence in the judicial system." *Id.* (quoting *Republic of the Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 660 (3d Cir.1991)). "As with other branches of government, the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud. Furthermore, the very openness of the process should provide the public with a more complete understanding of the judicial system and a better perception of its fairness." *Id.* It attempts to assure the public gains "a more complete understanding of the judicial system and a better perception of its fairness." *Id.* "In addition, access to civil proceedings and records promotes 'public respect for the judicial process' and helps to assure that judges perform their duties in an honest and informed manner." *Id.* (citation omitted) (quoting *Globe Newspaper Co.*

*v. Superior Court*, 457 U.S. 596, 606 (1982)); *accord Publicker Industries*, 733 F.2d at 1070

("From these authorities we conclude that public access to civil trials 'enhances the quality and

safeguards the integrity of the factfinding process.' *Id.* It 'fosters an appearance of fairness,' id.,

and heightens 'public respect for the judicial process.' *Id.* It 'permits the public to participate in

and serve as a check upon the judicial process -- an essential component in our structure of

self-government.' *Id.* Public access to civil trials, no less than criminal trials, plays an important

role in the participation and the free discussion of governmental affairs.") (quoting *Globe*

*Newspapers*, 457 U.S. at 606)).

 The "strong presumption" of openness does not permit the routine closing of judicial

proceedings. *Miller v. Indiana Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994). The United States Court

of Appeals for the Third Circuit expressly has "applied the presumption of public access to a

variety of civil hearings and records, including the transcript of a civil trial and exhibits admitted at

trial, *Littlejohn*, 851 F.2d 673; settlement documents filed with the district court as well as

post-settlement motions, *Bank of America*, 800 F.2d 339; and a civil hearing for a preliminary

injunction and transcripts of that hearing, *Publicker Industries*, 733 F.2d 1059." *Republic of the*

*Philippines*, 949 F.2d at 660. It also has applied it in a case where the claims have been

adjudicated and no further recourse is available. *Miller*, 16 F.3d at 551.

 "Access means more than the ability to attend open court proceedings; it also encompasses

the right of the public to inspect and to copy judicial records." *Littlejohn*, 851 F.2d at 678 (citing

*Criden*, 648 F.2d at 819). This is because documents filed with a court in the course of

adjudicatory proceedings generally must be presumed to have entered into the public domain.

*Leucadia*, 998 F.2d at 161-62. The presumption thus extends to all "pretrial motions of a

nondiscovery nature." *Leucadia*, 998 F.2d at 164.

In contrast, conducting discovery is not undertaken as part of the public component of civil adjudication and the presumption does not attach to discovery motions merely seeking shelter from overly aggressive demands or to compel more adequate responses. *Id.* This historical understanding is buttressed by the mechanisms embodied in Federal Rules of Civil Procedure 5(d) and 26(c) which provide normative rules governing public access to discovery and a mechanism for a court to lift or modify a protective order that is precluding a party from making public unfiled discovery materials. *Id.* (citing *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 789–90 (1st Cir. 1988), *cert. denied*, 488 U.S. 1030 (1989)).

The right of access applies to documents and evidentiary materials submitted in support of summary judgment. *Republic of the Philippines*, 949 F.2d at 660-61. The disposition of such a motion does not affect the presumption that applies to such submissions. *Id.* at 660. This is because the need for public scrutiny is at its zenith when the motion is dispositive and is of a comparable level when the motion is denied because the ruling tends to shape the scope and substance of the litigation as the parties proceed to trial. *Id.*; *accord Foltz v. State Farm Mut. Auto. Ins. Co.,* 331 F.3d 1122, 1135 (9th Cir. 2003) (the strong presumption in favor of public access applies with particular force to judicial records relating to summary judgment because those proceedings adjudicate the substantive rights of parties and often serve as a substitute for trial); *Carnegie Mellon University v. Marvel Technology Group, Ltd.*, 2013 WL 1336204, *10-11 (W.D. Pa. March 29, 2013) (documents filed with the court and incorporated or integrated into the court's adjudicatory proceedings are subject to the heightened standards mandated by the common law presumption of public access).

11

The same panoply of rights also are protected by the First Amendment. *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059, 1066-67 (3d Cir 1984). This protection applies to both civil and criminal proceedings. *Id.* at 1070 ("A presumption of openness inheres in civil trials as in criminal trials."). "However, the parameters of the First Amendment right of access to civil proceedings are undefined. There remain significant constitutional questions about what documents are subject to its reach." *In re Cendant*, 260 F.3d at 198 n. 13 (citing *Littlejohn*, 851 F.2d at 680 n. 14); *but see Delaware Coalition for Open Government, Inc. v. Strine*, 733 F.3d 510, 513-20 (3d Cir. 2013) (Sloviter, J.) (outlining with clarity the principles governing application of the First Amendment right of access to state-sponsored arbitration proceedings involving members of the Delaware judiciary).

"Just as the right of access is firmly entrenched, so also is the correlative principle that the right of access, whether grounded on the common law or the First Amendment, is not absolute." *Bank of America*, 800 F.2d at 344. "Every court has supervisory power over its own records and files, and access [appropriately] has been denied where court files might have become a vehicle for improper purposes." *Littlejohn*, 851 F.2d at 678 (quoting *Nixon*, 435 U.S. at 598). "The common law thus merely establishes a presumption of public access to court proceedings and court records." *Id.* (quoting *Nixon*, 435 U.S. at 602).[3]

"[T]he strong common law presumption of access must be balanced against the factors militating against access." *Id.* "The party seeking to seal any part of a judicial record bears the

---

[3] The First Amendment right of access likewise is not absolute and may be overcome provided the process employed affords "the due process protection that other fundamental rights enjoy." *Publicker Industries*, 733 F.2d at 1070. Under the First Amendment "the party opposing access [must] show 'an overriding interest based on findings that closure is narrowly tailored to serve that interest.'" *Bank of America*, 800 F.2d at 344 (quoting *Publicker Industries*, 733 F.2d at 1073).

heavy burden of showing that 'the material is the kind of information that courts will protect' and

that 'disclosure will work a clearly defined and serious injury to the party seeking closure.'"

*Miller*, 16 F.3d at 551 (citing *Publicker Industries,* 733 F.2d at 1071)); *accord Leucadia*, 998 F.2d

at 165 ("The burden is on the party who seeks to overcome the presumption of access to show that

the interest in secrecy outweighs the presumption.") (citing *Bank of America*, 800 F.2d at 344).

Such an injury must be shown with specificity. *Publicker Industries,* 733 F.2d at 1071. "Broad

allegations of harm, bereft of specific examples or articulated reasoning, are insufficient." *In re*

*Cendant Corp.*, 260 F.3d 194.

"Documents containing trade secrets or other confidential business information may be

protected from disclosure." *Leucadia*, 998 F.2d at 166 (citing *Nixon*, 435 U.S. at 598) ("courts

have refused to permit their files to serve as . . . sources of business information that might harm a

litigant's competitive standing.")). In *Westinghouse*, the Third Circuit recognized that "'[t]he

potential effects of the disclosure of business information that might harm the litigant's

competitive standing may in some cases meet the burden [needed to keep] the judicial record under

seal." *Westinghouse*, 949 F.2d at 663 (quoting district court); *accord Leucadia*, 998 F.2d at 166

(same) and *Littlejohn*, 851 F.2d at 685 (same).

The traditional form of confidential commercial information that militates against

disclosure is the existence of trade secrets where disclosure would create a sufficient threat of

irreparable harm. *Publicker Industries,* 733 F.2d at 1071 (citing *Stamicarbon, N.V. v. American*

*Cyanamid Co.*, 506 F.2d 532, 539-42 (2d Cir. 1974)). Documents do not contain trade secrets

merely because a party has deemed them to be confidential. *Littlejohn*, 851 F.2d at 685. To the

contrary, trade secrets generally have independent status under the substantive law. *Id.* (citing

13

Restatement of Torts § 757 comment b (1939) (definition of a trade secret)); *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003) ("The courts of this Commonwealth have generally accepted Section 757 of the Restatement of Torts as the basic outline for our trade secrets law."); 12 Pa. C. S. § 5301.

In contrast, "non-trade secret but confidential business information is not entitled to the same level of protection from disclosure as trade secret information." *Littlejohn*, 851 F.2d at 685; *Westinghouse*, 949 F.2d at 663 (business information alleged to be confidential is not entitled to the weight accorded to trade secrets). An interest in preserving the corporation's reputation from the commercial effects of embarrassment has not been given significant weight. *Littlejohn*, 851 F.2d at 685 (citing *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1180 (6th Cir. 1983) (harm to corporate reputation not sufficient to overcome common law presumption of access), *cert. denied*, 465 U.S. 1100 (1984)). Similarly, disclosures that merely carry a potential to affect adversely sales and/or a potential loss in capital stock value fall short of warranting secrecy. *Id.* ("The injury that BIC describes is an adverse effect on its disposable lighter sales by competitive use of the information and a potential loss in its capital stock value. However, as we stated in *Publicker*, '[t]he presumption of openness plus the policy interest in protecting unsuspecting people from investing in *Publicker* in light of its bad business practices are not overcome by the proprietary interest of present stockholders in not losing stock value or the interests of upper-level management in escaping embarrassment.'"). This includes information bearing on defects and safety concerns with products. *Id.* Sheltering such matters does not advance an important public interest or show with specificity how disclosure will work a clearly defined and serious injury to protectable business interests. *Id.* at 684 ("[E]scaping disclosure of

14

problems with [a company's] products which have injured consumers does not outweigh the presumption of openness plus the public interest in disseminating information about consumer goods that cause personal injury.").

In ordinary civil litigation, precluding access to the entire judicial record is a very unusual step. *Miller*, 16 F.3d at 551. Cases upholding such measures by the Third Circuit have been the exception. *Id.* These include: *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164 (3d Cir. 1986) (in banc) (internal documents of administrative agencies); *First Amendment Coalition v. Judicial Inquiry & Review Bd.*, 784 F.2d 467 (3d Cir. 1986) (*in banc*) (state judicial discipline proceedings); *Publicker*, 733 F.2d at 1073 (trade secrets); *United States v. Criden*, 681 F.2d 919, 921 (3d Cir. 1982) (*Criden* III ) (material explicitly determined to be impermissibly injurious to third parties); and *Criden* I, 648 F.2d at 829 (same); *accord Criden I*, 648 F.2d at 830 (Weis, J. concurring and dissenting) ("Counseling against access would be such matters as improper use, including publication of scandalous, libelous, pornographic, or trade secret material; infringement of fair trial rights of the defendants or third persons; and residual privacy rights."). The moving party must articulate "compelling countervailing interests to be protected" before such a measure can be employed. *Miller*, 16 F.3d at 551.

The "compelling countervailing interests" showing also applies where the civil litigation has a component of heightened public interest such as a class action where members of the public are also class members. *In re Cendant*, 260 F.3d at 194. The potential of the litigation to affect the rights of such members of the public gives rise to a heightened need for judicial transparency and warrants particular strictness in the test for overriding the right of access. *Id.* In such circumstances the heightened showing is required for sealing any process or hearing that is

important to the administration of the case.  *Id.*

Whether the material or information has been produced pursuant to a confidentiality order governing discovery is another factor that must be taken into account.  *Pansy*, 23 F.3d at 790.  The entry of a confidentiality order governing documents and information produced during discovery does not convert such materials into judicial records.  *Id.* at 782 ("Simply because a court has entered a confidentiality order over documents does not automatically convert those documents into 'judicial records' accessible under the right of access doctrine.  For example, when a court enters an order of protection over documents exchanged during discovery, and these documents have not been filed with the court, such documents are not, by reason of the protective order alone, deemed judicial records to which the right of access attaches.") (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 30–37 (1984); *Leucadia*, 998 F.2d at 163 & n. 9; and *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1119–20 (3d Cir. 1986), *cert. denied*, 484 U.S. 976 (1987)).

But as previously alluded to, a protective order entered under Federal Rule of Civil Procedure 26(c) does not assure that information initially designated as confidential and thereafter filed under seal will continue to remain secret.  *Leucadia*, 998 F.2d at 166.  The advisory committee notes long ago cautioned that "courts have not given trade secrets automatic and complete immunity against disclosure, but have in each case weighed their claim to privacy against the need for disclosure."  *Id.* (citing Fed. R. Civ. P. 26(c) advisory committee's note to 1970 amendment).  Upon challenge, filings made pursuant to a protective order are to be reviewed on a "document-by-document" basis to assure that the party seeking to maintain secrecy can make the "'particularized showing of the need for continued secrecy' if the documents are to remain under seal."  *Id.* (citing *Bank of America*, 800 F.2d at 346 (Settlement agreement filed

under seal ordered accessible because the parties were "no longer entitled to invoke the confidentiality ordinarily accorded settlement agreements.") and *In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d 139, 148 (2d Cir. 1987) (Where parties stipulated to umbrella protective order, district court acted within its discretion by vacating order and permitting access by intervenor to filed discovery materials "subject to a showing, on an individualized basis, of good cause for continued protection.").   Any order of "continued sealing must be based on 'current evidence to show how public dissemination of the pertinent materials [will continue to] cause the competitive harm [claimed]." *Id.* (quoting *Westinghouse*, 949 F.2d at 663); *accord Jackson v. Delaware River and Bay Authority*, 224 F. Supp.2d 834 (D. N.J. 2002) (parties' expectations warranted treating the record as if a confidentiality order had been entered and finding that the reasons initially advanced for confidentiality "no longer provid[ed] support for restricting access to the judicial record.").

The difference in the treatment of material designated as confidential under a protective order and material submitted as a judicial record flows in part from the showings needed to maintain secrecy in these respective realms.   In contrast to the standards applicable to maintaining judicial records under seal, a party seeking an order of protection over discovery material pursuant to Rule 26 must demonstrate that "good cause" exists for that protection.   Fed. R. Civ. P. 26(c); *Smith v. Bic Corp.,* 869 F.2d 194, 199 (3d Cir. 1989).   The burden of establishing good cause is on the party seeking the protective order.   *Cipollone*, 785 F.2d at 1121.

Good cause is "established on a showing that disclosure will work a clearly defined and serious injury to the party seeking closure.   The injury must be shown with specificity." *Publicker Industries,* 733 F.2d at 1071.   "Broad allegations of harm, unsubstantiated by specific

examples or articulated reasoning" will not suffice. *Cipollone,* 785 F.2d at 1121; *Pansy*, 23 F.3d 786. Factors that should be considered in the balancing test used to determine whether to enter a confidentiality order include whether the parties have an interest in privacy, whether there is a threat of particularly serious embarrassment to the party, whether the information is important to public health and safety, whether sharing of information among litigants will promote fairness and efficiency, whether the party benefiting from the confidentiality order is a public entity or official and whether the case involves issues important to public. *Pansy*, 23 F.3d at 787-788.

Where the parties have entered into an umbrella protective order that permits either party in the first instance to designate materials exchanged in discovery as confidential, the court may proceed by finding good cause for the various categories of information likely to be within the exchange of raw information. *Leucadia*, 998 F.2d at 166. A familiarity with those categories and a general understanding of what is anticipated can supply the foundation for a finding of good cause under Rule 26. *Id.* But as noted above, the filing of documents in support of adjudicatory action stands on different footing. Closer scrutiny is required in order "to protect the legitimate public interest in filed materials from overly broad and unjustifiable protective orders agreed to by the parties for their self-interests." *Id.* (citing *United States v. Corbitt*, 879 F.2d at 228; *accord Pansy,* 23 F.3d at 790 n. 26 (noting that while "blanket protective orders may be useful in expediting the flow of pretrial discovery materials, they are by nature overinclusive and are, therefore, peculiarly subject to later modification") (internal quotation marks and citation omitted).

Whether the parties have been given the expectation that their submission(s) will be treated as confidential also is a factor that must be taken into account. *LEAP Systems Inc. v. MoneyTrax,*

18

*Inc.*, 638 F.3d 216, 222 (3d Cir. 2011). A party's reliance on an order sealing a judicial document cannot be lightly brushed aside where the order has induced that party to settle a case or comply with a discovery request. *Id.* (citing *Pansy*, 23 F.3d at 790).

With the above principles in mind, we turn to the parties' specific requests to file materials under seal in support of their respective motions for summary judgment. Plaintiff moves to submit five different categories of information and defendant moves to submit a separate category, all of which they expect will be taken into account in making dispositive rulings in their dispute. Such filings are judicial records under the controlling precedent.

Meeting the good cause standard of Rule 26(c) cannot in itself provide the showing needed to seal the submission of judicial records to be utilized in a formal adjudication of central issues in a lawsuit. *Carnegie Mellon University*, 2013 WL 1336204 at * 4; *Littlejohn*, 851 F.2d 678, 684; *accord Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 533 (1st Cir. 1993) ("the ordinary showing of good cause which is adequate to protect discovery material from disclosure cannot alone justify protecting such material after it has been introduced at trial. This dividing line may in some measure be an arbitrary one, but it accords with long-settled practice in this country separating the presumptively private phase of litigation from the presumptively public.") (citing *Cowley v. Pulsifer*, 137 Mass. 392 (1884) (Holmes, J.)). A higher standard and a heavier burden comes into play once the materials are submitted for an adjudication on the merits. *Carnegie Mellon University*, 2013 WL 1336204 at * 4. At the very least, at this juncture "the party seeking the closure of a hearing or the sealing of part of the judicial record 'bears the burden of showing that the material is the kind of information that courts will protect' and that 'disclosure will work a clearly defined and serious injury to the party seeking closure.'" *In re Cendant*, 260 F.3d at 194

(quoting *Miller*, 16 F.3d at 551).[4]

Further, this case raises numerous issues of public importance and has the potential to affect the rights of numerous carriers, insureds and claimants that/who are not directly before the court. Several aspects of the parties' dispute support this assessment.

First, the parties' dispute arises under an occurrence-based insurance policy that utilizes to a significant degree what typically is referred to as standard form language and/or provisions. *See* Amended Complaint at ¶¶ 11-19. For example, the policy provides:

"COVERAGE"

---

[4] As Judge Fischer observed pursuant to a motion to reconsider the application of this standard to materials submitted in conjunction with summary judgment and/or trial, the First, Second, Sixth, Ninth, Eleventh, Federal and DC Circuits all have held that meeting the standard for sealing materials submitted as part of an adjudication on the merits is well-above the "good cause" standard required for a confidentiality order and to seal non-dispositive motions that are only incidental or ancillary to the court's resolution of the parties' dispute. *Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 2013 WL 1674190, *2 & n.4 (W.D. Pa. April 17, 2013) ("the Court remains of the opinion that consideration of Marvell's present motion under the "compelling interest" standard is warranted.") (citing *Poliquin*, 989 F.2d at 533 ("only the most compelling showing can justify post-trial restriction on disclosure of testimony or documents actually introduced at trial"); *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("we have also consistently held that the public has an especially strong right of access to evidence introduced in trials"); *In re Knoxville News–Sentinel Co., Inc.*, 723 F.2d 470, 476 (6th Cir. 1983) ("Only the most compelling reasons can justify non-disclosure of judicial records."); *Foltz*, 331 F.3d at 1135 (the right of access to all court records can only be overridden for "sufficiently compelling reasons"); *Wilson v. Am. Motors Corp.*, 759 F.2d 1568, 1571 (11th Cir. 1985) (a heightened standard exists since "absent some exceptional circumstances, trials are public proceedings" and so before denial of public access to trials, other Court proceedings and associated records, it must be shown that such closure "is necessitated by a compelling governmental interest, and is narrowly tailored to that interest"); *In re Violation of Rule 28(D)*, 635 F.3d 1352, 1358 (Fed. Cir. 2011) ("where the party seeks to limit the disclosure of information actually introduced at trial, an even stronger showing of prejudice or harm may be required to warrant limitations on disclosure"); *In re Nat. Broad. Co., Inc.*, 653 F.2d 609, 614 (D.C. Cir. 1981) (holding that the "fact that the tapes were admitted into evidence and played to the jury weighs heavily" as first, "trial is a public event, and what transpires in the court room is public property. Second, the tapes had been seen and heard by those members of the press and public who attended the trial. Our cases have recognized that such previous access is a factor which lends support to subsequent access.").

- [Defendant] will pay on behalf of [plaintiff] ultimate net loss in excess of the total applicable limit ... of underlying insurance or the amount of the self-insured retention when no underlying insurance applies, because of bodily injury ... to which this insurance applies, caused by an occurrence.

- The term "bodily injury" is defined in the Hartford policy as follows: "bodily injury" means bodily injury, sickness or disease sustained by any person which occurs during the policy period[.]

- The term "ultimate net loss" is defined in the Hartford policy as follows: "ultimate net loss" means all sums which [plaintiff] and his or her insurers shall become legally obligated to pay as damages, whether by final adjudication or settlement with [Hartford]'s written consent, after making proper deduction for all recoveries and salvages collectible[.]

- The term "damages" is defined in the Hartford policy as follows: "damages" do not include fines or penalties or damages for which insurance is prohibited by the law applicable to the construction of this policy.   Subject to the foregoing, "damages" include damages for any of the following which result at any time from bodily injury to which this policy applies: death, mental anguish, shock, disability or care and loss of services or consortium[.]

Amended Complaint at ¶¶ 14-17.   Thus, rulings on the parties' basic duties and obligations under the policy (by this court and potentially the United States Court of Appeals for the Third Circuit) will in all likelihood have precedential influence well beyond the resolution of this case.

Second, the parties' dispute arises in an area where the contractual relationship between the parties is regulated significantly by the judiciary.   *See e.g. 401 Fourth Street, Inc. v. Investors Ins. Group*, 879 A.2d 166, 171-72 (Pa. 2005) (setting forth the well-established principles that govern the interpretation of an insurance contract and surveying "the fast-emerging consensus of jurisdictions regarding the nature and scope of the policy language" at issue in determining whether the policy provided coverage under the circumstances); *accord Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900-07 (3d Cir. 1997) (applying well-established principles that govern the interpretation of an insurance contract in determining that pollution exclusion barred coverage

but holding that material issues of fact nevertheless existed under the reasonable expectations doctrine even though insured was a sophisticated insured); *American and Foreign Ins. Co. v. Jerry's Sport Center, Inc.*, 2 A.3d 526 (Pa. 2010) (setting forth established principles governing a carrier's duty to defend under Pennsylvania law and surveying divergent lines of cases in resolving an insurer's ability to limit its liability where the ultimate duty to indemnify is uncertain); *J. H. France Refractories*, 626 A.2d at 507 (surveying "abundant authority" in adopting "multiple-trigger approach" for bodily injury claims based on exposure to asbestos).   In other words, whether standard insurance provisions provide a duty to defend and/or a duty to indemnify for personal injury and wrongful death claims under any particular circumstances involve determinations that are informed by the public policy of the Commonwealth of Pennsylvania. That public policy often is derived from the multi-jurisdictional precedent on CGL policy insurance coverage.

　　　Third, the parties dispute whether plaintiff has exhausted the underlying insurance, whether the availability of "other insurance" precludes coverage under the umbrella policy, the degree to which plaintiff had knowledge regarding the dangers of the substances that caused injury to the underlying claimants and the ability of plaintiff's products to protect against those dangers. *See e.g.* Report and Recommendation of Special Discovery Master re North River Company's Motion to Compel (Doc. 207) at 2; Report and Recommendation of Special Discovery Master Granting North River's Motion for Reconsideration (Doc. 438) at 3-4 (Noting that "North River contends that the requested information is relevant to determining the applicability of North River's policies because North River's policies do not provide coverage if other insurance covers the same claim and/or [general] expenses" and granting defendant's motion to compel because its

"disputed interrogatories and document request are quite relevant at this stage of the proceedings.").   The issues raised by defendant also have implicated plaintiff's claims-handling and settlement practices.   Rulings and/or determinations in these areas have the potential to impact concretely the legal rights of third parties.

Fourth, the parties' advance differing theories about the appropriate trigger of coverage. This disputed issue was raised repeatedly during discovery and at this juncture it "is a matter for determination at summary judgment or other stage of the proceedings."   Report and Recommendation of Special Discovery Master Granting North River's Motion for Reconsideration (Doc. 438) at 4.   Rulings and/or determinations in this area have the potential to impact concretely the legal rights of third parties.

Fifth, plaintiff has at times utilized the practice of assigning the right to collect a portion of settlement proceeds directly from one of its umbrella or excess carriers.   *See* Defendant's Response in Opposition (Doc. No. 671) at 15 (Outlining settlement between plaintiff and injured parties in action wherein plaintiff settled the case and paid part of the proceeds to those parties and assigned to them the right under another of defendant's umbrella policies covering plaintiff " to collect directly from North River the remaining amount of the settlement.").   The court's resolution of the parties' dispute will have the potential to affect the rights of all other claimants who have entered to similarly structured settlement agreements where those settlement agreements have not been definitively resolved.   *See e.g. id.* at 17 ('the [claimants] stand in the shoes of [plaintiff]").

Sixth, plaintiff has challenged various aspects of defendant's claims-handling, including the formulation of its position on the availability of coverage under the policy, and accused it of

orchestrating a scheme to "squeeze" plaintiff into accepting less than it is entitled to in violation of Pennsylvania's bad faith insurance practices statute. Whether defendant engaged in an inappropriate course of claims-handling and/or made decisions regarding the availability of coverage that may subject it to liability under the statute are governed by the law as it has evolved. *See e.g. Polselli Nationwide Mutual Ins. Co.*, 23 F.3d 747, 751-52 (3d Cir. 1994) (ascertaining applicable standard of proof, nature of prohibited conduct, and required state-of-mind from existing precedent); *Klinger v. State Farm Mutual Automobile Insurance Co.*, 115 F.3d 230, 233 (3d Cir. 1997) (Although the term "bad faith" on the part of an insurer is construed as encompassing "any frivolous or unfounded refusal to pay proceeds of a policy" and ordinarily imports "a dishonest purpose and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill-will[,]" the statue does not require a plaintiff to prove that the insurer consciously acted pursuant to such a motive or interest; it is enough if the insurer recklessly disregarded the lack of a reasonable basis in denying benefits.) (quoting *Terletsky v. Prudential Property and Casualty Insurance Co.*, 649 A.2d 680, 688 (Pa. Super. 1994). These assessments are matters of public importance. Rulings and/or determinations in this area have the potential to impact concretely the legal rights of other carriers and/or insureds not before the court.

In short, the parties' dispute arises under standard form provisions commonly used in the insurance industry. The resolution of the issues to be raised has the potential to impact (1) the duties and obligations of other carriers from which plaintiff has sought or will seek coverage, (2) the availability of insurance coverage for a great number of third-party claimants who have brought personal injury and wrongful death against plaintiff, and (3) other insureds, claimants and

carriers that have been or are presented with similar underlying claims. The parties disagree about core concepts under the policy and related law, such as whether proper exhaustion has occurred; whether defendant has rights of contribution from other carriers; the limits of the policy; whether defense costs are in addition to the limits on indemnification; whether plaintiff can avail itself of the procedures in *J. H. France Refractories* and designate defendant as the carrier to respond to the tendered claims; the appropriate trigger of coverage for asbestos, silica, coal-mine-dust and similarly related claims; whether defendant properly has fulfilled its claims-handling responsibility; whether defendant's chosen course of conduct can give rise to liability under Pennsylvania's bad faith insurance practices statute; whether plaintiff's claims-handling and settlement practices satisfy the requirements and obligations under the policy and so forth.

It is readily apparent that the parties' dispute is not a garden-variety personal injury or breach of contract claim and its resolution has the potential to affect the rights and remedies of other carriers, insureds and third-party claimants. In other words, the parties' dispute involves issues of public importance that have the ability to affect directly and indirectly the rights of others not before the court. Consequently, the test for overriding the right of access must be applied with recognition of these potential consequences.

Plaintiff has identified the following category of documents:

(i)     documents discussing or demonstrating how MSA defends, values, or settles the bodily injury lawsuits filed against it in which the plaintiffs allege, inter alia, that MSA's respiratory protection equipment failed to properly filter out certain irritants, thus contributing to plaintiffs' alleged respiratory injuries (the "Underlying Claims" or "Underlying Litigation") and/or reflecting attorney-client communications or the work product of MSA's defense counsel in the Underlying Litigation;

(ii)    documents evidencing or revealing the value of the settlements between MSA and the plaintiffs in the Underlying Litigation;

(iii)   documents containing information that has not been the subject of discovery with respect to all of the Underlying Claims;

(iv)    documents setting forth certain opinions and testimony of the medical expert witnesses in the instant coverage litigation; and

(v)     documents produced by, or deposition testimony taken of, entities other than MSA or North River in the parallel state court litigation (North River Insurance Company v. Mine Safety Appliances Company, et al., Court of Common Pleas of Allegheny County, Pennsylvania, Docket No. G.D. 10-00432 (the "State Court Action")) which have been designated as "Confidential" subject to the Protective Order issued in the State Court Action, and which designation has not been withdrawn by that entity.

Plaintiff's Brief in Support (Doc. No. 653) at 4-5.   Plaintiff notes that the documents and testimony sought to be filed are subject to protective orders in this and the related state court action.   They also contain information from the underlying litigation that is subject to the attorney-client privilege and/or the attorney work product doctrine, which privileges have been preserved during discovery in this litigation by entry of the following protective order:

It is further ORDERED that any disclosure made in the course of the instant litigation by (i) MSA; (ii) any designated representative of MSA; or (iii) counsel defending MSA in any of the Underlying Claims, including but not limited to Karen K. Maston, Esquire, of information or documents containing information subject to the attorney-client privilege and/or the attorney work product doctrine, which relate to the Underlying Claims or to the litigation of the Underlying Claims, shall not result in a waiver of such privilege or protection by MSA.   This Order shall apply to any such disclosures previously made in the course of the instant litigation.

Id. at 8-9; Order of July 27, 2011 (Doc. No. 81).

The documents and information referenced in plaintiff's designated categories (i) and (ii) are similar in nature and give rise to consideration of many of the same interests.   More specifically, plaintiff identifies the documents within category (i) as consisting of (a)

26

correspondence (including e-mail) between plaintiff's defense counsel in the underlying litigation, plaintiff, and plaintiff's insurers regarding litigation and/or settlement strategy; (b) e-mail exchanges between plaintiff's defense counsel in the underlying litigation and plaintiff regarding litigation and/or settlement strategy in the underlying litigation; (c) an e-mail exchange between plaintiff's local defense counsel and plaintiff's counsel in the instant litigation regarding local defense counsel's practices in handling the underlying litigation; (d) a report summarizing a specific underlying case in advance of a mediation; (e) deposition testimony taken in the instant action of plaintiff's director: litigation and risk management regarding defense and settlement strategy in the underlying litigation; (f) an e-mail from plaintiff's insurer to plaintiff's counsel in the instant litigation regarding litigation and settlement strategy with respect to underlying claims; and (g) a summary chart prepared by plaintiff's defense counsel in the underlying litigation reflecting attorney work product concerning the underlying claimants. Plaintiff's Brief at 5-6. Plaintiff identifies the documents within category (ii) as consisting of (a) a chart produced by it in the instant litigation which contains, among other things, the settlement amount for each of the 394 underlying claims for which plaintiff seeks indemnification; (b) correspondence (including e-mail) between plaintiff (or its counsel) and its insurer(s) that includes the value of the settlement of one or more of the underlying claims; (c) loss runs prepared by plaintiff's insurers setting forth, among other things, the value of the settlement of multiple underlying claims and/or the percentage of such settlement paid by the insurer; and (d) correspondence between or among plaintiff, plaintiff's defense counsel, and/or plaintiff's insurers regarding the settlement of underlying claims and including information regarding the allocated payment obligations of the insurers to those settlements. *Id.* at 6-7.

Plaintiff argues that public revelation of this information will result in the disclosure of its "playbook" for defending, trying and settling the underlying claims which in turn will result in severe economic harm by inhibiting its ability to resolve pending and future underlying claims through litigation and settlement.[5]  It will result in substantial harm due in part to the detrimental effect disclosure will have on plaintiff's ability to defend and settle the additional 9,100 underlying claims it is facing across the nation "relating to the same and similar products."  Plaintiff's Brief at 11.  From its perspective public dissemination of such information could be taken out of context and/or used strategically to plaintiff's significant economic detriment.  It essentially would place its own strategic insights into the hands of its adversaries and provide them with information that they would not have the right to receive, thereby giving them an unfair advantage in the underlying litigation.  Plaintiff further explains that disclosures of this nature would disseminate information plaintiff conveyed to its defense counsel in reliance on the attorney-client privilege; and disclosure of information reflecting its or its insurers' settlement strategy would result in the dissemination of information protected by attorney work product.

Plaintiff's invocation of the attorney client and work product privileges as support for use of this court's authority to seal must be evaluated in accordance with the context in which it arises. The record fails to contain any basis that would permit disclosure of the referenced documents and information to defendant in a manner consistent with maintaining the privileges.  In other words, in the absence of the protective order of July 27, 2011, plaintiff would have been faced with the difficult choice of either (a) invoking the privileges to preclude disclosure of the documents and

_____

[5] Of course, such disclosure likewise would affect defendant and its fellow carriers to the extent they are obligated to pay indemnification and/or defense costs for such pending and future claims.

28

information to defendant or (b) waive them due to the need or strategic decision to use the information affirmatively to (1) establish its claims or (2) counter positions anticipated from defendant. A review of the basic tenants of the privileges demonstrates the accuracy of this assessment.

The work-product doctrine is codified in Federal Rule of Civil Procedure 26(b), which provides that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial" unless otherwise discoverable or the party shows substantial need for the material. Fed. R. Civ. Proc. 26(b)(3). In the seminal case of *Hickman v. Taylor*, 329 U.S. 495 (1947), the Supreme Court first recognized the doctrine pursuant to the principle that permitting attorneys to prepare their cases without fear that their work product would be used against their clients advances the adversarial system. *Id.* at 510-11. In *United States v. Nobles*, 422 U.S. 225, 238 (1975), the Supreme Court further opined that the doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." Included within this category are trial preparation documents that reflect the fruits of the attorney's endeavors, any compendium of evidence prepared by the attorney and any of the attorney's mental impressions, opinions or theories. *Id.* at 236-39. Also protected are those materials prepared by an attorney's agent. *Id.* at 238-39.

The party seeking the protection has the burden of proving the doctrine applies. *Conoco, Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 730 (3d Cir.1982). Once that burden has been met, protected work product is "afforded near absolute protection from discovery." *In re Cendant Corp. Sec. Litig.*, 343 F.3d 658, 663 (3d Cir. 2003). A limited exception exists where the party seeking disclosure can demonstrate a substantial need for the material and the inability without

undue hardship to obtain the substantial equivalent of it by other means.   Fed. R. Civ. P. 26(b)(3).

Disclosure of work product to a third party does not necessarily negate the ability to claim the evidentiary privilege that attaches to work product.   Under federal law, a party may continue to assert the protections of the work-product doctrine only when the disclosure to a third party furthers the doctrine's underlying goal.   *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1429 (3d Cir. 1991).

Plaintiff's disclosure of privileged work product with a carrier that has denied all tendered claims and has not sought to assist plaintiff in any manner in defending against the tendered or other underlying claims is not an action designed to further the work-product doctrine's underlying goals.   It is the equivalent of releasing such information to an adversary in order to resolve a legal dispute, which is inimical to protecting and preserving the work product in order to maintain secrecy over the information, strategies and insight it provides.   *Compare Westinghouse Elec. Corp.*, 951 F.2d at 1429 (Declining to endorse a selective waiver approach and holding that the disclosure of work product to government agencies that were potential adversaries in order to convince them to take no action or a more lenient course of action waived the privilege "as against all other adversaries."); *accord In re Chrysler Motors Corp. v. Overnight Evaluation Program Litigation*, 860 F.2d 844, 846 (1st Cir. 1988) ("Disclosure to an adversary waives the work product protection as to items actually disclosed, even where disclosure occurs in settlement.") (*quoting Grumman Aerospace Corp. v. Titanium Metals Corp. of America*, 91 F. R. D. 84, 90 (E.D. N.Y. 1981) and citing *Chubb Integrated Systems Ltd. v. National Bank*, 103 F. R. D. 52, 67 (D.D.C.1984)); *United States v. Massachusetts Institute of Technology*, 129 F.3d 681, 687 (1st Cir. 1997) (disclosure to a potential adversary in an effort to defuse a potential controversy

constitutes a waiver of the work product privilege); *Jones v. Nationwide Mut. Fire Ins. Co.*, 2010 WL 181753, * 2 (M.D. Pa. Jan 12, 2010) (same).  Consequently, in the absence of the protective order a waiver of the work product privilege has occurred.

A federal court sitting in diversity must look to state law for the applicable legal principles on issues of privilege.  *See* Fed. R. Evid. 501; *United Coal Co. v. Powell Constr. Co.*, 839 F.2d 958, 965 (3d Cir. 1988).  The Pennsylvania rule on attorney-client privilege has been codified since 1887.  *Nationwide Mutual Ins. Co. v. Fleming*, 992 A.2d 65, 68 (Pa. 2010) (Justice Eakin) (affirming Superior Court by equally divided Court); *accord Upjohn v. United States*, 449 U.S. 383, 389 (1981) (The attorney-client privilege is "one of the oldest of the privileges for confidential communications known to the common law.").  The statute in its current form provides:

> In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa. C. S. § 5928.  "[T]he attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice."  *Gillard v. AIG Insurance Co.*, 15 A.3d 44, 59 (Pa. 2011).

The showing necessary to establish the attorney-client privilege is settled:

> (1) (When) legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*In re Grand Jury*, 603 F.2d 469, 474 (3d Cir. 1979) (citing J. Wigmore, EVIDENCE § 2292 at 554 (1961)); *see also In re Impounded*, 241 F.3d 308, 316 n. 6 (3d Cir. 2001). "The burden of proving that the (attorney-client) privilege applies is placed upon the party asserting the privilege." *In re Grand Jury*, 603 F.2d at 474 (citing among other cases *United States v. Landof*, 591 F.2d 36, 38 (9th Cir. 1978)).

The attorney-client privilege serves laudable purposes and thus is "[w]orthy of maximum protection." *Haines v. Liggett Group Inc.*, 975 F.2d 81, 90 (3d Cir. 1992). Nevertheless, the privilege obstructs the truth-finding process and is to be construed narrowly. *Westinghouse Elec. Corp.*, 951 F.2d at 1423. The privilege "protects only those disclosures – necessary to obtain informed legal advice – which might not have been made absent the privilege." *Id.* (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

"In Pennsylvania, the attorney-client privilege is an absolute privilege; it is not a limited privilege that is inapplicable whenever a court determines that the case cannot be fairly decided if the privilege is invoked." *Mueller v. Nationwide Mutual Ins. Co.*, 31 Pa. D. & C.4th 23, 1996 WL 910155, *31 (Ct. of Com. Pleas of Allegheny County, May 22, 1996) (Wettick, J.). Nevertheless, "[p]rotection under attorney-client privilege is subject to limits, exceptions, and waiver." *Nationwide Mut. Ins. Co. v. Fleming*, 924 A.2d 1259, 1265 (Pa. Super. Ct. 2007).

A client can waive the attorney-client privilege in a number of ways. One is by disclosing a protected communication to a third party. *Id.* (citing *Loutzenhiser v. Doddo*, 260 A.2d 745, 748 (Pa. 1970); *Joe v. Prison Health Services, Inc.*, 782 A.2d 24, 31 (Pa. Commw. Ct. 2001)). Such a disclosure "has long been considered inconsistent with an assertion of the privilege." *Westinghouse Elec. Corp.,* 951 F.2d at 1424 (citing *United States v. AT & T*, 642 F.2d 1285, 1299

(D.C. Cir. 1980)).   An exception to this rule is recognized where the disclosure to the third party is necessary to receive informed legal advice.   *Id.* at 1423.   Accordingly, the "courts have held that the client may allow disclosure to an 'agent' assisting the attorney in giving legal advice to the client without waiving the privilege."   *Westinghouse*, 951 F.2d at 1423; *accord United States v. Kovel*, 296 F.2d 918, 921 (2d Cir. 1961) (because "the complexities of modern existence prevent attorneys from effectively handling clients' affairs without the help of others," the attorney-client "'privilege must include all the persons who act as the attorney's agents.'"   *Id.* at 921 (quoting 8 Wigmore, EVIDENCE, § 2301).

A party also can waive the attorney-client privilege by asserting claims or defenses that place privileged communications at issue.   *Rhone-Poulenc*, 32 F.3d at 864.   The privilege is not waived merely because the nature of the claims place the state-of-mind of one of the parties at issue.   *Mueller*, WL 910155 at *35-39 (rejecting assertion of implied waiver of attorney-client privilege in bad faith insurance practices setting premised on state-of-mind being at issue: "While [the] plaintiffs suggest that any implied waiver doctrine can be confined to bad faith claims against insurance companies, [the] plaintiffs' justification for this exception to the attorney-client privilege (the *Hearn* [*v. Rhay*, 68 F.R.D. 574 (E.D. Wash. 1975)] justification that a court should not decide a factual issue regarding the state of mind of a party without consideration of all relevant evidence) would justify the loss of the privilege in a wide variety of cases because of the ability of a creative party to make the state of mind of another party an issue in the case."); *accord Rhone-Poulenc*, 32 F.3d at 864 ("A party does not lose the privilege to protect attorney client communications from disclosure in discovery when his or her state of mind is put in issue in the action.").   Although an attorney's advice may well be relevant to a party's state of mind, "the privilege applies as the

interests it is intended to protect are still served by confidentiality." *Rhone-Poulenc*, 32 F.3d at 864 (applying Pennsylvania law).

In contrast, a waiver will be recognized where a party intends to use the advice of counsel to support an asserted claim or defense in the litigation. *Rhone-Poulenc*, 32 F.3d at 863. For example, using the advice of counsel to support a claim for affirmative relief, such as a professional malpractice claim, or to (1) advance an essential element to a defense, (2) prove an affirmative defense, or (3) negate a showing required by the adverse party will work a waiver of the privilege. *Id.* "In these cases, the client has made the decision and taken the affirmative step in the litigation to place the advice of the attorney in issue. Courts have found that by placing the advice in issue, the client has opened to examination facts relating to that advice." *Id.* at 863; *accord Mueller*, 1996 WL 910155 at *36, *42 (Under Pennsylvania law "a party waives the privilege if it intends to rely on portions of the privileged communications in establishing a claim or defense.").

Where the privilege has been waiver through such actions, the privilege is waived for all communications on the same subject. *Nationwide Mutual Ins. Co. v. Fleming*, 924 A.2d 1259, 1265 (Pa. Super. 2007) ("A litigant attempting to use attorney-client privilege as an offensive weapon by selective disclosure of favorable privileged communications has misused the privilege; waiver of the privilege for all communications on the same subject has been deemed the appropriate response to such misuse.") (citing *Murray v. Gemplus International, S.A.*, 217 F.R.D. 362, 367 (E.D. Pa.2003)), *aff'd*, 992 A.2d 65 (2010). In other words, "the disclosure of any meaningful part of a purportedly privileged communication 'waives the privilege as to the whole.'" *United States v. Rockwell International*, 897 F.2d 1255, 1265 (3d Cir. 1990) (quoting *United*

*States v. El Paso Co.*, 682 F.2d 530, 538 (5th Cir. 1982)).

A waiver of the attorney client privilege operates to vitiate the privilege as to all and for all purposes and time. *Genentech, Inc. v. United States Intern. Trade Com'n*, 122 F.3d 1409, 1417 (Fed. Cir. 1997) ("Once the attorney-client privilege has been waived, the privilege is generally lost for all purposes and in all forums."). As the *Genentech* court explained:

> When the attorney-client privilege has been waived, whatever the subject matter of the waiver, the privilege is gone. The client, therefore, may no longer use the privilege to prevent access to the communications in question by either the party who successfully challenged the privilege claim or by anyone else in the present or future litigation. Having had the opportunity to assert and address the privilege claim in a judicial proceeding, the privilege holder is thereafter barred, under the doctrine of res judicata and collateral estoppel, from relitigating the resolved claim.

*Id.* (quoting Paul R. Rice, *Attorney–Client Privilege in the United States* § 9:85, at 9–295 (1993) and citing 8 John H. Wigmore, *Evidence in Trials at Common Law* § 2328(1), at 639 (1961) ("[W]aiver at a first trial should suffice as a waiver for a later trial since there is no longer any reason for preserving secrecy.") and Edna S. Epstein & Michael M. Martin, *The Attorney–Client Privilege and the Work–Product Doctrine*, 76 (2d ed. 1988) ("Once an express or implicit waiver has occurred, the privilege is generally treated as relinquished for all purposes and in all circumstances thereafter."). And the majority of courts consistently have rejected the concept of a selective or limited waiver because such a rule would be inconsistent with the underpinnings of the privilege. *Id.* at 1418; *Westinghouse Elec. Corp.,* 951 F.2d at 1424-25 (rejecting the selective waiver concept adopted in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir.1978) (*en banc*) and following *Permian Corp. v. United States*, 665 F.2d 1214 (D.C. Cir. 1981) because the selective waiver doctrine adopted in *Diversified Industries* has little to do with "the privilege's purpose - protecting the confidentiality of

attorney-client communications in order to encourage clients to obtain informed legal assistance" or improving the attorney-client relationship.).

There are two caveats to the attorney-client privilege that occasionally arise in settings underlying insurance coverage disputes: the "common interest" (also known as "community of interest") and the "co-client" doctrines. *Camico Mutual Insurance Co. v. Heffler, Radetich & Saitta, LLP*, 2013 WL 315716, *1 (E.D. Pa. 2013).[6] When applicable, these doctrines permit a limited or selective disclosure of privileged communications among all co-client or common-interest parties. The doctrines are often invoked by one party to gain access to information being withheld as privileged by another when co-client or common-interest clients sue each another. *See e.g., id.* The principles and boundaries of these doctrines remain unsettled under Pennsylvania law. *Id.*

The United States Court of Appeals for the Third Circuit examined these doctrines in *In re Teleglobe Communications Corp.*, 493 F.3d 345 (3d Cir. 2007). There, the court undertook a "contemplative analysis" of the doctrines in a case predicated on Delaware law. *Camico*, 2013 WL 315716 at *1. *In re Teleglobe* has become a leading opinion in these areas and provides persuasive authority as to Pennsylvania law. *Id.*

The "common interest" exception can arise where separate clients retain different attorneys who then share information with each other pursuant to a common legal interest. *Id.* at *2. This often arises where co-defendants are required to retain separate counsel to avoid potential conflicts over contingent or subsidiary issues that might arise in the case. *Id.* Where the information is shared pursuant to this common interest "it is not privileged as between those clients." *Id.* (citing

---

[6] These doctrines can arise in other setting as well.

*Teleglobe*, 493 F.3d at 365-66).   It does remain privileged as to all others.   *Teleglobe*, 493 F.3d at

364.   The consent of all clients generally is required to waive privileged communications

generated from the shared attorney-client communications.   *Id.*

"Pennsylvania state courts have held that under the 'common interest' exception, separate

counsel for different clients is required."   *Camico*, 2013 WL 315716 at *2 (citing *In re*

*Condemnation by City of Philadelphia in 16.2626 Acre Area*, 981 A.2d 391, 397–98 (Pa. Commw.

Ct. 2009)).   The clients must be parties to litigation or involved in similar or related legal

proceedings that implicate essentially the same interest against a common adversary.   *In re*

*Condemnation by City of Philadelphia in 16.2626 Acre Area*, 981 A.2d at 397.   "[A] shared

common business interest or an interest that is solely commercial is insufficient to warrant

application of the privilege."   *Id.* at 398 (citing *Katz v. AT & T Corp.*, 191 F. R. D. 433 (E.D. Pa.

2000) and *Executive Risk Indemnity, Inc. v. Cigna Corporation*, 81 Pa. D & C 4th 410 (2006)).

The "co-client" exception to the attorney-client privilege comes into play when two or

more clients utilize the same attorney.   *Camico*, 2013 WL 315716 at *2.   When this exception

applies, the default rule is that all communications in the course of the joint representation are

discoverable by each client in the event of litigation between them but otherwise remain privileged

as against third parties.   *Id.* (citing *Teleglobe*, 493 F.3d at 366 and *Tracy v. Tracy*, 105 A.2d 122

(Pa. 1954) (attorney-client privilege does not "apply if the attorney represented both parties to the

transaction, in which case no communications in relation to the common business are privileged in

favor or against either, but only against a common adversary.").   A caveat "is that a client may

unilaterally waive the privilege as to its own communications with a joint attorney, so long as

those communications concern only the waiving client; it may not, however, unilaterally waive the

privilege as to any of the other joint clients' communications or as to any of its communications that relate to other joint clients." *Teleglobe*, 493 F.3d at 363.

Courts considering whether the co-client exception applies under Pennsylvania law where a carrier hires an attorney for its insured have answered the inquiry differently. *Id.* Some federal courts have interpreted Pennsylvania law to encompass an absolute rule whereby the insured and insurer are always considered to be co-clients when the carrier pays for the defense. *Id.* at *3 (citing among other cases *Northwood Nursing & Convalescent Home, Inc. v. Cont'l Ins. Co.*, 161 F. R. D. 293, 295 (E.D. Pa. 1995) (where insurer agreed to defend underlying action, the insured "ha[d] no reasonable expectation of privilege" as against the insurer). Others have rejected this notion. *Id.* (citing *Ingersoll–Rand Equip. Corp. v. Transp. Ins. Co.*, 963 F. Supp. 452, 454 (M.D. Pa.1997) ("When an insurer retains an attorney to represent an insured, pursuant to the insurer's duty to defend, that attorney's client is the insured, not the insurer.") and *Point Pleasant Canoe Rental, Inc. v. Tinicum Twp.*, 110 F. R. D. 166, 170 (E.D. Pa. 1986) (same)).

The appellate courts of Pennsylvania have opined that "a co-client relationship does not exist simply by virtue of the insurer-insured relationship." *Id.* In *Eckman v. Erie Ins. Exchange*, 21 A.3d 1203, 1209 (Pa. Super. Ct. 2011), the Superior Court rejected an absolute rule that a co-client relationship arises when the insurer funds the defense of the insured. *Id.* Instead, a court must look to the surrounding circumstances to determine whether the parties had the intent to create a joint-client relationship, including "how the parties interact[ed] with the joint attorneys and with each other." *Id.* at *4 (quoting *Teleglobe*, 493 F.3d at 363).

Moreover, co-client undertakings "must . . . be distinguished from situations in which a lawyer represents a single client, but another person with allied interests cooperates with the client

38

and the client's lawyer." *Id.* (quoting *Teleglobe*, 493 F.3d at 362 (quoting Restatement (Third) of the Law Governing Lawyers § 75 cmt. c)). The co-client exception "simply doesn't apply if the attorney never represented the party seeking the allegedly privileged materials." *Remington Arms Co. v. Liberty Mut. Ins. Co.*, 142 F. R. D. 408, 418 (D. Del. 1992). Similarly, a shared interest between a carrier and an insured in minimizing the insured's exposure to liability does not in itself create a co-client relationship. *Camico*, 2013 WL 315716 at *6.

Here, plaintiff's pleadings and the record belie the existence of any common interest or co-client exception that would permit plaintiff to share the documents with defendant and avoid a waiver of the attorney-client privilege. First, plaintiff has averred that it began to tender numerous settled underlying claims to defendant for indemnification in 2007 and continued to do so in 2008. First Amended Complaint at ¶¶ 24-26. Plaintiff reiterated its demand for payment in February of 2009 and informed defendant that pursuant to *J. H. France Refractories* it was selecting defendant "to assume responsibility pursuant to the Policy for the indemnity and defense costs associated with other settled Underlying Claims" which encompassed the settlement of lawsuits involving claims by approximately 400 claimants. First Amended Complaint at ¶ 28. Defendant assertedly has failed and refused to comply with its obligations under the policy. *Id.* at ¶ 34. It has not paid anything toward the amounts claimed by plaintiff. *Id.* at ¶ 34. Instead, it has responded with "a carefully and deliberately orchestrated effort to delay and/or avoid payment of proceeds due under the Policy, with the ultimate goal of leveraging [plaintiff] into accepting far less than that to which it is entitled under the Policy (and under other excess liability policies that [defendant] issued to [plaintiff])." *Id.* at ¶ 35. Thus, the allegations of the complaint indicate defendant was not involved in providing a defense or in establishing an ongoing relationship

39

involving the defense of the underlying claims tendered for indemnification and/or the coverage of defense costs.

Similarly, the record fails to document any scenario where plaintiff and defendant hired separate counsel and then directed their counsel to engage in a joint defense against a common adversary. Nor does it contain any factual basis to support the notion that plaintiff and defendant had the intent to utilize a lawyer for common representation and thereby create a co-client relationship.

Neither the common interest nor the co-client exceptions to the attorney-client relationship apply. Consequently, the doctrines that could permit a selective waiver of the attorney client privilege in the instant setting are unavailable and the record does not provide any independent legal justification for plaintiff to disclose attorney-client communications to defendant and thereafter retain the right to assert the privilege as to third parties.

Moreover, the record demonstrates that plaintiff has vehemently sought to protect the privileges where it has grounds for doing so. *See e.g.* Report and Recommendation of Special Discovery Master re North River's Motion to Compel Production of Documents Withheld on the Basis of Privilege (Doc. 472-1) (noting among other things that plaintiff withheld 1,867 documents reflected in its privilege log; defendant sought to compel 900 of these, and the parties employed an ongoing process to narrow the issues before the Special Discovery Master and resolve their disputes as to materials withheld on the basis of privilege); *see also* Report and Recommendation of Special Discovery Master re Mine Safety Appliances Company's Motion For Reconsideration of Report and Recommendation of Special Discovery Master re North River's Motion To Compel Production of Documents Withheld on the Basis of Privilege (Doc. No. 482-1)

and Clarification of Report and Recommendation of Special Discovery Master re North River's Motion To Compel Production of Documents Withheld on the Grounds of Privilege (Doc. No. 483) and Amendment Thereto (Doc. No. 484).   Areas in dispute have included the boundaries between plaintiff's counsel's role in claims-handling and as coverage counsel as well as those involving the role of Gleason & Associates - plaintiff's litigation and claims consultant.   *See* Report and Recommendation of Special Discovery Master re North River's Motion to Compel Production of Documents Withheld on the Basis of Privilege (Doc. 472-1) at 7.   These also were areas in contention with regard to plaintiff's redacted documents.   *See* Report and Recommendation re North River's Motion to Compel Production of Documents Redacted on the Grounds of Privilege (Doc. No. 486) (resolving defendant's challenge to virtually all 225 documents on plaintiff's redaction log and attaching [486-1] state court Report and Recommendation resolving challenge to 842 of over 1,500 documents listed on plaintiff's several privilege logs); Report and Recommendation re North River's Motion to Compel Production of Documents Relating to MSA Consultant's Claims Handling Role Withheld on the Basis of Privilege (Doc. No. 487) and attaching [487-1] state court Report and Recommendation of Special Discovery Master re North River's Motion to Compel Production of Documents Relating to MSA Consultant's Claims Handling Role Withheld on the Basis of Privilege (resolving defendant's objections to 535 of 592 documents withheld); Report and Recommendation of Special Discovery Master re North River's Motion to Compel Production of Documents Relating to MSA Consultant's Claims Handling Role Redacted on the Basis of Privilege (Doc. No.s 494, 494-1) (resolving defendant's federal and state court challenge to 629 of over 1,400 redacted documents involving communications between plaintiff and Gleason & Associates).   Plaintiff also

41

unsuccessfully has sought to claw back privileged documents after they have been produced.  *See* Report and Recommendation of Special Discovery Master re North River's Objections to MSA's Request That Certain Documents Be Returned Based on Alleged Privilege (Doc. No. 592) (denying plaintiff's request for relief in accordance with Report and Recommendation entered in the state case).

It follows that plaintiff has preserved its rights to withhold documents on the basis of attorney-client privilege and work-product wherever it had grounds to do so.   Thus, thousands of documents have not been examined by defendant and cannot become part of the record because of these privileges.

It further follows that in the absence of the protective order, any privilege attaching to the materials and testimony that have been produced has been waived.   Waiver of the attorney-client privilege has occurred for at least two basic reasons: (1) disclosure to a third party and/or (2) being placed at issue in relation to plaintiff's breach of contract and bad faith claims and its defense against defendant's position on exhaustion and meeting the prerequisites to the grant of coverage. Defendant has become a third-party to the underlying communications between (a) plaintiff and its underlying defense counsel; (b) plaintiff, its underlying defense counsel and its insurers; and (c) plaintiff's insurer and its coverage counsel.   The disclosures were not for the purpose of obtaining legal advice.

Furthermore, much if not all these disclosures are "at issue."   A central component of the parties' dispute is whether a number of the underlying settlements fall within the grant of coverage or were handled and resolved in a manner that places them within it.   Significant aspects of this are whether certain of the settled or otherwise resolved claims properly were attributed to the

underlying insurance and thus are to be credited in satisfying the exhaustion requirement and whether certain of the settled or otherwise resolved claims involved claimants who had claimed (a) exposure to a harmful substance as a result of using one of plaintiff's products and (b) that the exposure occurred while or before the policy was in effect.   Much of the dispute underlying these central matters is grounded in the way plaintiff approached and settled the underlying claims, including the nature and type of information used by plaintiff in making decisions to settle, whether appropriate diligence was employed by plaintiff's underlying counsel to assure that the claimant's asserted claims were grounded in facts that brought the claims within the grant of coverage (i.e., that exposure allegedly occurred at a time that can be attributed to the policy period and from the use of one of plaintiff's products), whether significant value was gained for both parties from the resolution of the underlying claims and so forth.   It also involves plaintiff's and the Hartford's treatment and allocation of several of those underlying claims.

It is clear that plaintiff intends to rely on the communications within categories (i) and (ii) to establish one or both of its claims or to otherwise counter positions advanced by defendant. These communications and information thus fall within the scope of the "at issue" doctrine.   The relinquishment of the privileges under these circumstances waives the ability to claim them as against the world.

It is against this backdrop that plaintiff's invocation of the court's authority to seal on the basis of the attorney-client and work product privileges must be evaluated.   And it follows that when evaluated in the instant setting the principles underlying the use of such privileges do not provide a forceful basis to place such information under seal.

The documents in categories (i) and (ii) are not the type of material the courts will protect

43

through the use of the seal in the absent of the ability to invoke and preserve the privileges in the first instance. Plaintiff has failed to advance a single case where a court has permitted the use of its authority to seal to substitute for the loss of the attorney-client privilege and/or the work product privilege. The court's extensive research likewise has failed to find anything to support the *a priori* reasoning plaintiff has advanced as to these categories. While the direct loss of the ability to preclude examination and use of privileged material under a straightforward application of attorney-client and work product privilege law is not conclusive as to the inquiry and balancing regarding the use of the seal, the proposition that ongoing protection from such disclosure is warranted because of the deleterious effect disclosure will have in dealing with third parties is significantly undercut. If the law of privilege does not directly protect a party from the consequences of revealing such materials in the public record pursuant to an adjudication with one's adversary because the disclosure neither is consistent with nor advances the purposes to be served by the privileges, then the ability to shelter the same disclosures from third parties through some alternative method likewise cannot be said to be consistent with or advance the purposes to be served by the privileges. In other words, it follow *a fortiori* that the interests in protecting the privileges from being disclosed to third parties is not of paramount concern and ought not to be an object or policy to be furthered at significant cost to the bright light designed to maintain the public's trust in judicial integrity.

The fact that plaintiff sought to shelter these documents under the protective order does not provide significant support for recognizing the materials in categories (i) and (ii) as being within the type of materials that the courts will protect from disclosure. Plaintiff's unilateral designations under the protective order did not change the nature of the documents and

communications.  The protective order was entered to govern the exchange of raw information during discovery and does not even purport to control the court's use of its seal in the adjudicatory process.  While plaintiff had the right to place some reliance on the protective order's prohibition against further dissemination of the information produced, the protective order did not contain any provision that enhanced either party's ability to control disclosure to third parties beyond the legal basis that the party actually possessed for claiming the underlying information to be confidential in the absence of the protective order.

A privilege that has been waived through voluntary disclosure to a third-party in a manner inconsistent with the privilege or striped because of a party's strategic use of the information and/or communication does not in itself provide a sound basis for protecting the revealed information from disclosure to third parties.  It falls short of constituting the type of materials that courts will protect through the use of the seal.

Plaintiff also has failed to show that "disclosure will work a clearly defined and serious injury to" it.  The proposition that it has and will continue to proceed in resolving the 9,100 pending claims in a ridged, formulaic manner is divorced from the reality that personal injury cases and the settlement of them are based on their individual circumstances, the existing strengths and weakness therein, the personalities involved and a host of legal, social, business and practical considerations.  The applicable codes of professional conduct demand that the lawyers approach settlement of such cases with full recognition of these considerations.  Given this constellation of variables, the assertion that the revelation of past settlement approaches and resolutions in particular cases will prejudice the ability to negotiate future settlements in different cases is the type of generalized harm that falls short of presenting a clearly defined serious injury that is

concrete and particularized.

Moreover, the interest in promoting settlement consistently has been held to fall short of the showing needed to maintain judicial documents under seal. Judge Sloviter, who has authored numerous opinions in this area, analyzed the competing interests between fostering settlement of litigation and public access to judicial documents:

> We acknowledge the strong public interest in encouraging settlement of private litigation. Settlements save the parties their substantial cost of litigation and conserve the limited resources of the judiciary. In order to encourage the compromise and settlement of disputes, evidence of settlements or offers of settlement are ordinarily not admissible in federal proceedings. *See* Fed. R. Evid. 408 and advisory committee note thereto; Fed. R. Civ. P. 68. Thus, it is likely that had HRA and the Bank chosen to settle and file a voluntary stipulation of dismissal, as provided in Rule 41(a)(1) of the Federal Rules of Civil Procedure, they would have been able to prevent public, and even FAB III's, access to these papers. That is not the course the parties chose.
>
> Instead, HRA and the Bank filed their settlement agreement in the district court, because, as they frankly concede, they anticipated that they would disagree on the terms, and would want recourse to the court. That, of course, is precisely what occurred.
>
> Judge Garth has written an interesting and vigorous essay about the importance of settlement to the overburdened court systems of this country. Since the proposition is self-evident, it is intended to, and undoubtedly will, touch a sympathetic chord in the hearts of all judges who, after all, bear much of the burden of the litigation explosion to which Judge Garth refers.
>
> Noteworthy, however, is the fact that Judge Garth practically ignores the relevant posture of the case before us. This is not like *FDIC v. Ernst & Ernst*, 677 F.2d 230 (2d Cir. 1982), which he relies on, where there was an effort to unseal a settlement agreement made two years earlier. Here, there were motions filed and orders entered that were kept secret, in direct contravention of the open access to judicial records that the common law protects. FAB III began its efforts to unseal the court papers almost immediately after these court documents were filed and sealed.
>
> In the name of encouraging settlements, Judge Garth would have us countenance what are essentially secret judicial proceedings. We cannot permit the expediency of the moment to overturn centuries of tradition of open access to court documents and orders.
>
> Having undertaken to utilize the judicial process to interpret the settlement and to enforce it, the parties are no longer entitled to invoke the confidentiality ordinarily accorded settlement agreements. Once a settlement is filed in the district court, it becomes a judicial record, and subject to the access accorded such records.

*Bank of America*, 800 F.3d at 344-35. Thus, "the generalized interest in encouraging

46

settlements does not rise to the level of interests that [the Third Circuit has] recognized may outweigh the public's common law right of access." *Id.* at 836; *accord LEAP Systems, Inc.*, 638 F.3d at 222 ("Nor can a district court 'rely on the general interest in encouraging settlement' to justify the sealing of an agreement which the parties mistakenly believed would remain confidential.").

Admittedly, plaintiff's articulates more than a generalized interest in encouraging settlements; it seeks to protect its settlement strategy from public disclosure in order to assure its effectiveness in future settlements of the thousands of personal injury and wrongful death claims it must continue to face and litigate to resolution. But the information it seeks to seal is not a trade secret or proprietary commercial information that traditionally has received significant protection from public disclosure. And the interest plaintiff seeks to protect is different in kind from the harm to competitive market activity deemed to be worthy of protection in *Nixon* and subsequently referenced in Rule 26(c)(1)(G). *See Leucadia*, 998 F.2d at 166 (the presence of trade secrets or other business information that can be used to harm a litigant's "competitive standing" in the marketplace weighs against the right of access) (citing *Nixon*, 435 U.S. at 598 ("courts have refused to permit their files to serve as . . . sources of business information that might harm a litigant's competitive standing."); *Westinghouse*, 949 F.2d at 663 ("[t]he potential effects of the disclosure of business information that might harm the litigant's competitive standing may in some cases meet the burden [needed to warrant keeping] the judicial record under seal"); *Cf. Apple Inc. v. Samsung Electronics Co., Ltd.*, 727 F.3d 1214, 1225, 1228 (Fed. Cir. 2013) (Parties' respective profit, cost and margin data that could be used by their suppliers in contract negotiations to extract price increases for

component parts and Apple's market research reports derived from consumer survey data that could be used by its competitors to predict Apple's future product releases and marketing campaigns constituted the type of information that could be used to the parties' competitive disadvantage.); *Joint Stock Soc. v. UDV North America, Inc.*, 104 F. Supp.2d 390, 405 (D. Del. 2000) (disclosure of distiller's consumer research studies, strategic plans and marketing information that if disclosed would give competitors new insights into how its product is advertised, distributed and marketed had the potential to subject the distiller to serious competitive injury).

Indeed, the information plaintiff seeks to maintain under seal is admittedly used by it to further the company's financial wellbeing in the face of claims premised on allegedly defective and failing products distributed throughout its niche market. Information that is not a trade secret or proprietary business information used in maintaining competitive market standing but nevertheless might injure a company's commercial standing through its disclosure because it relates to defective products, poor or embarrassing business practices or similar commercial shortcomings has not been given significant weight where the information is used in a formal adjudication. *See Littlejohn*, 851 F.2d at 685 (upholding district court's determination that "defendant's interest in escaping disclosure of problems with its products which have injured consumers does not outweigh the presumption of openness plus the public interest in disseminating information about consumer goods that cause personal injuries" on grounds that (1) the information was not a trade secret, (2) an otherwise private interest in confidentiality has not been given significant weight where the information has been used at trial and (3) the desire to preserve company reputation and avoid adverse consequences to capital stock value are not

the forms of competitive injury that will outweigh the public right of access); *Republic of Philippines v. Westinghouse Electric Corp.*, 139 F.R.D. 50, 62 (D. N.J. 1991) ("'proprietary business information' including: confidential information relating to Westinghouse's analysis and evaluation of the [nuclear power plant] contract and the positions taken and strategies employed by Westinghouse in negotiating that contract, that, if available to potential Westinghouse customers, would severely restrict Westinghouse's ability to negotiate future contracts, and if available to Westinghouse's competitors, would result in their gaining an invaluable competitive advantage; confidential information relating to Westinghouse's agreements with its Special Sales Representatives ("SSRs"), that, if disclosed, would damage Westinghouse's ability to negotiate such contracts with future SSRs, would encourage present SSRs to take advantage of the terms they consider to be more advantageous than those in their own agreements, and would provide Westinghouse's competitors with a substantial advantage in similar negotiations; and confidential information relating to Westinghouse's candid internal evaluations and assessments of customers, competitors, subcontractors, government officials, and other entities, disclosure of which would give an advantage to Westinghouse's competitors and would damage Westinghouse's business relationships with the subjects of those evaluations and assessments" all were aimed at protecting the company's reputation and thus failed to identify the type of injury that can overcome the strong presumption of access that attaches to filings for summary judgment), *stay denied*, *Republic of Philippines v. Westinghouse Electric Corp.*, 949 F.2d 653, 663 (3d Cir. 1991) (perceived financial consequences that might flow from injury to a company's public image do not identify a competitive disadvantage that will supply the particularized showing needed for continued secrecy).

In other words, the financial injury plaintiff claims will be imminent upon disclosure is not a form of competitive injury that courts will utilize their authority to minimize or eliminate. To the contrary, the United States Court of Appeals for the Ninth Circuit has directly held that information that is used by a party to shelter itself from additional liability and litigation is not the type of harm from which a court should provide protection. *See Foltz*, 331 F.3d at 1137 ("This disclosure might harm State Farm by exposing it to additional liability and litigation, as noted above, but a litigant is not entitled to the court's protection from this type of harm."). Other courts have reached the same conclusion. *See Nestle Foods Corp. v. Aetna Cas. and Sur. Co.*, 129 F.R.D. 483, 486 (D. N.J. 1990) ("if the basis for defendants' motion is to prevent information from being disseminated to other potential litigants, then defendants' application [for a Rule 26(c) protective order] must fail. . . . The courts have emphatically held that a protective order cannot be issued simply because it may be detrimental to the movant in other lawsuits.") (collecting cases); *Wauchop v. Domino's Pizza, Inc.*, 138 F.R.D. 539, 546–47 (N.D. Ind. 1991) ("That the shared information might be detrimental to Domino's in other litigation does not transform the concern into good cause . . . .") (citing *United States v. Hooker Chemicals & Plastics Corp.*, 90 F.R.D. 421, 426 (W.D. N.Y. 1981) ("Hooker also argues that the disclosure of information garnered through discovery will be detrimental to its position in parallel lawsuits. This is unquestionably true. However, this is not a reason for a court to impose a protective order.")); *Culinary Foods, Inc. v. Raychem Corp.*, 151 F.R.D. 297, 301 (N.D. Ill. 1993) (declining to issue a protective order over information that was detrimental to the defendant's legal interests in parallel or subsequent litigation but indicating that relief may be available where the information reflects only a trade secret that could give rise to a

50

competitive injury).

Finally, the information plaintiff seeks to maintain under seal is of public importance to defendant, its fellow carriers, the underlying claimants with unresolved claims and future claimants. The parties' dispute encompasses numerous issues of public importance, including plaintiff's claims-handling role, what constitutes proper exhaustion, the burden of proving the judgments or settled claims fall within the grant of coverage, the trigger of coverage for each type of dust/substance exposure involved, whether general administrative expenses in coordinating a national defense may be apportioned and proportionally allocated as a form of ultimate net loss covered under the policy and so forth. Other carriers and all current and future claimants have a significant interest in knowing (1) the types of litigation and settlement practices that will be deemed to be acceptable and give rise to indemnification under the standard terms in the policy and (2) the range and type of evidence and information as well as the legal arguments and precedents that a court will consider and find important in resolving these disputes. These entities and individuals are members of the public and have the potential to have their rights affected by the resolution of the issues forming the parties' dispute. That interest cannot be summarily discounted in the name of protecting the plaintiff's ability to minimize its financial exposure from the debacle created by its past products.

Plaintiff has failed to carry its burden of establishing that the materials in categories (i) and (ii) consist of the kind of information that courts will protect and that disclosure of it will work a clearly defined and serious injury to plaintiff. Thus, the record and controlling law do not support plaintiff's invocation of the court's authority to seal to shelter it from public dissemination.

Plaintiff's reliance on the protective order must be considered.   The July 17, 2011, protective order was proffered by plaintiff and did not proclaim to govern the public use of any material produced thereunder in an adjudication on the merits.   It merely declared that the "information or documents containing information subject to the attorney-client privilege and/or the attorney work product doctrine, which relate to the Underlying Claims or to the litigation of the Underlying Claims, shall not result in a waiver of such privilege or protection by MSA."   Order of July 17, 2011.

Although the record contained a basis for a finding of good cause under Rule 26 at the time the order was entered, the order cannot reasonably be understood to (1) have made binding determinations about the rights of third parties not before the court or (2) govern the proceedings inviolate and notwithstanding the subsequent development of the record.   The order did not even purport to address such matters.   Further, the settled law regarding reformation of such orders in conjunction with the public right of access precluded the reasonableness of such an understanding.

In context, the July 17, 2011, order protected plaintiff's ability to maintain the privileges as between the parties and it provided plaintiff with the ability to avoid the difficult choice of having to elect between disclosing such information to defendant without a complete understanding of the issues as they would exist at the time of adjudication and waiving the protections in an effort to (1) resolve or narrow the parties' dispute or (2) otherwise present its best or preferred case.   Having afforded plaintiff the ability to forego this election does not overcome the strong presumption of public access that attaches to the filings the parties are contemplating.   Nevertheless, plaintiff's reliance on the protective order cannot be ignored on the basis that presentation of the record as advocated cannot be sanctioned and further development of the record will be inconvenient and

consume additional resources.

In light of the above, plaintiff will be permitted to assert the attorney client and/or work product privileges as to any information and documents that are protected under the July 17, 2011, protective order where the applicable privilege has not been waived (or will not be) by the material (1) being placed at issue or (2) falling within the scope of the waiver resulting from the documents and communications being placed at issue.[7]   Defendant will be permitted to challenge any such asserted privilege pursuant to the principles set forth in this opinion.   To the extent plaintiff can successfully maintain the privileges, the information will be barred from being used in the public record and plaintiff will gain the benefit of preserving the privilege as to all third parties, including the underlying claimants and their counsel.   To the extent the matters are conceded or otherwise determined to have been waived by being placed at issue (or for any other reason other than the mere disclosure of the information to defendant), then the matters may be used by either party in making their election to file judicial documents into the public record in support of an adjudication on the merits.

The above procedure will avoid any undue prejudice from plaintiff's reliance on the July 17, 2011, protective order.   Plaintiff will be able to preserve the right to shelter from further disclosure any information or documents that were produced solely in reliance on the order.   The procedure also strikes the proper balance between preserving such privileged material and the public disclosure that will ensue from the strategic use of privileged information and communications and the whole of certain documents and communications being placed at issue.

---

[7]  Of course, plaintiff's introduction of such privileged information into the record for summary judgment or at trial will be deemed to be placing it at issue.

The remaining categories of information similarly fall short of the showing needed to maintain judicial documents under seal. The parties each intend to use material from each of the remaining categories in support of their respective motions for summary judgment.

Category (iii) consists of documents and information generated in this litigation that has not been made available to the underlying claimants. Specifically within this category is the testimony of one of plaintiff's consulting experts utilized in the underlying litigation and the testimony of plaintiff's director of litigation and risk management. The testimony of these witnesses were generated by deposition in this action.

Category (iv) consists of documents containing information that has not been the subject of discovery with respect to all of the underlying claims. Within this category are documents setting forth certain opinions of the medical expert witnesses in the instant coverage litigation consisting of (a) the expert reports of plaintiff's designated medical experts; (b) the expert reports of three of defendant's designated medical experts; (c) excerpts from the deposition testimony of two of plaintiff's designated medical experts; and (d) excerpts from the deposition testimony of two of defendant's designated medical experts.

Plaintiff emphasizes that the material in category (iii) has not been the subject of discovery "with respect to all the Underlying Claims." The information is "not necessarily an appropriate subject of discovery with respect to all of the Underlying Claims as the testimony is privileged and protected from disclosure." Its disclosure will lead to litigation costs because the underlying claimants will seek to obtain the full depositions and demands for similar testimony and/or information. The material in category (iv) consists of excerpts from expert testimony produced for the instant litigation wherein the experts opine and offer conclusions about whether there has

been "personal injury" as defined in the relevant insurance policies as opposed to whether there has been a "compensable injury" within the meaning of the tort law that governs liability in the underlying cases. Revelation of these select excerpts will present the opportunity for the underlying claimants to take the information out of context and in turn "make it substantially more difficult to reach a negotiated resolution of cases and lead to increased defense costs associated with defending the Underlying Claims." Thus, from plaintiff's perspective all these materials need to be filed under seal and the sections of the summary judgment briefs and concise statements and counter statements filed with corresponding redactions.

These categories of information consist mainly of expert opinion testimony that the parties intend to use to resolve their disputes regarding (1) whether the conditions of the grant of coverage are satisfied and (2) the trigger of coverage for each of the distinct types of substances and resulting personal injury alleged in the underlying claims. The information clearly will be "at issue." The ability of such information to impact and affect the rights of third parties not before the court virtually is self-evident.

The information within each of these categories is not the type that courts will protect for many of the same reasons that place the previously addressed categories beyond the availability of that protection. Plaintiff's reliance on "privilege" is undercut sufficiently for the reasons set forth above: the testimony is being placed at issue and the court's authority to seal is not a proper substitute for the consequences of that strategic decision; and protecting a litigant from further exposure in other litigation through the sharing of information is not a proper function of the court's authority.

At its base the expert medical testimony is the type of information that each party uses to

enhance its litigation position.   Various opinions on the progression and manifestation of diseases produced by exposure to air borne toxins or irritants and the impact of those opinions in the setting of public policy regarding the availability of insurance coverage do not occupy a special status within the information to be considered in resolving such matters.   To the contrary, such expert testimony is both run-of-the-mill from a litigation tactic and yet very important to the resolution of the questions of public policy underlying this area of the parties' dispute.   That such information would not necessarily be discoverable and/or might be subject to misinterpretation by counsel in the underlying litigation does not cloak it with the attributes needed to place it in the category of information akin to trade secrets or matters that jeopardize the personal safety of government witnesses and members of his or her family.   The information identified in these categories simply does not constitute the type of materials that courts will protect.

Furthermore, the disclosure of the information in these categories is essential to understanding the bases for the rulings that will emerge from the court's disposition of the parties' summary judgment motions.   Thus, the need for disclosure is only more compelling.   *See Mosaid Technologies Inc. v. LSI Corp*, 878 F. Supp.2d 503, 512 (D. Del. 2012) (permitting the parties to seal information about pricing, finances and patent valuation that was peripheral to the parties' dispute and could be used by competitors and other licensing agents to undercut future licensing negotiations but requiring the disclosure of the parties' interpretations of their patent license agreements because they were   central to their dispute and neither the fact that such disclosure might lead to future litigation nor the detriment to the parties' negotiation strategies in entering into new licensing agreements was "the sort of competitive disadvantage" needed to "outweigh the strong presumption in favor of public access.").

The court's inability to analyze and discuss publically the record advanced for legal rulings on undisputed facts would subject its rulings to uncertainty and render its opinion meaningless with regard to precedential valve.   Such an approach is unworkable under our centuries-old system of stare decisis.   *Cf. Carnegie Mellon University*, 2013 WL 1336204, * 11 n. 29 ("This Court's opinion will document any evidence it feels necessary to explain its determination, regardless of the parties' positions on confidentiality.   The Court does not issue "*lettres de cachet*" or proceed as a Star Chamber or other prerogative courts.   *See In re Oliver*, 333 U.S. 257, 268 . . . (1948).   This Court is a function of our collective federal government, sworn to adjudicate cases both for the parties and for the good of the public."); *Mosaid Technologies Inc.*, 878 F. Supp.2d at 510 ("The parties have sought relief in a public forum" and the court's resolution cannot be based on a discussion that obscures the nature of the parties' dispute or otherwise turns the court into something less than "a transparent forum.") (*quoting In re Eastman Kodak Company's Application*, 2010 WL 2490982, at *1–2 (S.D. N.Y. June 15, 2010)).

The fact that either party sought to shelter these documents under the protective order does not provide significant support for submitting such information under seal.   The parties' unilateral designations under the protective order did not change the nature of the testimony or provide carte blanc authority to control the court's use of its seal in the adjudicatory process.   While plaintiff had the right to place some reliance on the protective order's prohibition against further dissemination of the testimony and any related documents produced, the protective order did not contain any provision that enhanced either party's ability to control disclosure to third parties beyond the legal basis that the party actually possessed for claiming the underlying information to be confidential.   Those bases clearly fall short of identifying the type of material that justifies the

relief sought given the developed record.

Moreover, the record fails to demonstrate that either party will suffer a clearly defined and serious injury from its disclosure.   It is clear that each party runs the risk of losing pieces in its war chest as to future litigation or having the risk of any testimony misused or taken out of context in similar or related litigation; but as explained above, such a claimed injury is a generalized harm that does to rise to the level of the concrete and palpable injury needed and is not the type of specific financial harm that a court may protect against through the use of its authority to seal.   It would be improper for the court to partner with either of the parties in an effort to assure their future litigation positions are not vulnerable by information properly revealed in the resolution of the pending litigation.

It likewise cannot be overlooked that in combination categories (i) through (iv) would inject material under seal virtually into all of the main issues for resolution in the litigation.   Like the parties contemplated motions and supporting materials, the court's resolution would be riddled with redactions correlating to materials under seal.   This would have the effect of causing the court either to issue an opinion that is so redacted that its meaning could not be understood or to place the opinion and concomitant order under seal.   In either event, the entire disposition virtually would be removed from public review.   This would remove from public disclosure most if not all of the court's resolution of the parties' dispute.   That resolution has the potential to affect the rights of other insurers and insureds as well as third-party claimants, all of whom are not before the court.   Compelling countervailing interests are needed for such action.   *Miller*, 16 F.3d at 551.   The parties have not presented such interests.

The materials in category (v) likewise fall short of the mark.   This category consists of

documents or deposition testimony produced in the parallel state court litigation by entities other than the parties which has been designated as "confidential" under the protective order issued in the state court action, and which designation has not been withdrawn by that entity. Specifically, these include documents produced by Harbor Insurance Company and testimony given by an employee of Allstate Insurance Company.

It has long been settled that a party's unilateral designation of material as confidential under a broad protective order does not in itself supply a sufficient basis to file judicial documents under seal. *Leucadia*, 998 F.2d at 166; *Pansey*, 23 F.3d at 789-90 & n. 26. The party seeking to file a judicial document under seal has the burden of establishing that the grounds for secrecy are present.

Plaintiff's reference to other parties' designations of confidentiality in another case does to supply the showing needed to overcome the presumption of public access. There are a number of ways plaintiff could have proceeded. It could have obtained and presented supplemental information from Harbor and Allstate that meets the heightened standards for filing documents under seal. It could have sought permission in the state court for modification of its protective order so that the information could be filed into the instant record. It could have entered into an agreement with Allstate and/or Harbor that permitted it to use the information or a modified version of it in the judicial filings in this record. To the extent it has failed to either reduce the information to a form that can be filed into the public record or obtained information to warrant the filing of such information under seal independent of the initial designation, it has failed to meet its burden and it would be disingenuous for this court to place the imputer of it seal over information that is subject to the public right of access.

Finally, defendant has presented a motion to seal (1) personal identification information contained in the health records of the underlying claimants and (2) documents produced and designated as confidential by Continental Insurance Company and The Hartford. As to the first category, defendant seeks to redact the personal identification information within the meaning of the Health Insurance Portability and Accountability Act that is contained in the records of the underlying claimants. As to the second, defendant seeks to file under seal insurer loss runs, discussions of a "cost-sharing" agreement between some of plaintiff's insurers, a letter to an insurance carrier discussing a settlement proposal, medical records from four claimants, another insurer's payment of a settlement amount and a chart listing a settlement payment by various insurers.

Defendant requests that it be permitted to redact all of the above from its "brief, statement of material facts, and exhibits filed in support of its motion for summary judgment." Defendant's Motion to File Documents Under Seal (Doc. No. 654) at ¶ 27. It would file un-redacted versions for this court's consideration "that would not be made available to the public for the Court's consideration in ruling on North River's Motion." *Id.* at ¶ 28.

Defendant's motion will be granted to the extent it seeks to redact the personal identification information of the underlying claimants in the exhibits submitted in support of its motion. The removal of such information is authorized or within the spirit of Federal Rule of Civil Procedure 5.2(a) and Local Rule 5.2. In addition, it does not appear at this juncture that the redaction of such information in the actual exhibits will inhibit this court's consideration, analysis and discussion of the parties' contemplated motions.

Defendant will be required to file all briefs and statements or counter statements of

material facts into the public record. It shall devise a method of presentation that will permit plaintiff and this court to analyze and discuss the claimant files in an intelligent and straightforward manner.

The balance of defendant's motion will be denied. The specific information within the insurer loss runs, "cost-sharing" agreement, letter discussing a settlement proposal, medical records from four claimants, payment of a settlement and chart listing a settlement payment by various insurers cannot be filed under seal for the same reasons plaintiff cannot file similar material under seal.

The parties are hereby advised that "[a]s an undertaking funded by the people of the United States, [this court's] decision will be publicly published to decide both the matter at hand, and also guide other entities on the law." *Carnegie Mellon University*, 2013 WL 1336204, * 11 (citing *Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983) ("[O]pen proceedings may be imperative if the public is to learn about the crucial legal issues that help shape modern society. Informed public opinion is critical to effective self-governance.")). To the extent the parties desire to have their dispute resolve in private by a body that is bound to secrecy, they are free to employ the forum that readily offers such benefits: arbitration. *See Delaware Coalition for Open Government*, 733 F.3d at 516-17 (noting the development of modern arbitration practice, the numerous associations and groups that provide such services and the parties' ability to make such forums and the resolutions therein "distinctly private"); *Mosaid Technologies Inc.*, 878 F. Supp.2d at 512 ("The parties have sought relief in a public forum, and yet their proposed redactions would obscure any discussion of the actual nature of the parties' dispute. There are other forums - such as arbitration - available if parties wish to protect all of this type of information from public view.")

(citing *Global Reinsurance Corp. - U.S. Branch v. Argonaut Ins. Co.*, 2008 WL 1805459, at *1 (S.D. N.Y. Apr. 24, 2008) (noting that one of the "princip[al] advantages of arbitration" is "confidentiality")).   They are also free to resolve their dispute through mediation, which would likewise shelter the sensitive information in question from public disclosure.

The court is aware of the cost to the parties and in some ways the cost to the truth-finding process that comes with proceeding in an open forum.   But the public nature of forum in which the parties have chosen to air their dispute and the manner of operation needed for the forum to maintain its legitimacy and integrity extract certain costs from the litigants that come before it. But for very limited circumstances, the publicity of an adjudication is one of those costs.   The parties have not met the heavy burdens needed to permit this court to operate in secret.   *Compare id.* ("Yet if the Court were to grant Defendants' application to seal all portions of the transcript that make any reference to the terms of the underlying agreements, it would effectively convert itself into an arbitral tribunal, where the presumption is that all materials will be kept confidential and not be disclosed to the public.   It is therefore unsurprising that no party to this litigation has cited a single instance where a judge in this District has redacted a civil judicial transcript in the manner requested here.").   Consequently, their respective motions to seal will be denied in all material aspects.

For the reasons set forth above, the parties respective motions to seal will be denied in all material aspects (with the minor exception of being permitted to redact personal identification

information in the exhibits containing the underlying claimant's health records). An appropriate

order will follow.

<u>Date: March 31, 2014</u>

<u>s/David Stewart Cercone</u><br>
David Stewart Cercone<br>
United States District Judge

cc:    Brian T. Himmel, Esquire
George L. Stewart, II, Esquire
Michael H. Sampson, Esquire
Alan S. Miller, Esquire
Bridget M. Gillespie, Esquire
Dennis O. Brown, Esquire
Henry M. Sneath, Esquire
Robert A. Nicholas, Esquire

(*Via CM/ECF Electronic Mail*)